## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| EDMOND ZAGORSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v | ) | No. |
| | ) | |
| | ) | |
| BILL HASLAM, in his official capacity | ) | |
| as GOVERNOR; | ) | DEATH PENALTY CASE |
| | ) | |
| TONY PARKER, in his official capacity | ) | EXECUTION DATE 10/11/18 |
| as COMMISSIONER, Tennessee | ) | at 7:00 p.m. |
| Department of Corrections; and | ) | |
| | ) | |
| TONY MAYS, in his official capacity | ) | |
| as WARDEN, Riverbend Maximum | ) | |
| Security Prison. | ) | |

## COMPLAINT

**Preamble**

On October 8, 2018, facing his imminent execution, Edmund Zagorski was forced to decide between dying from chemical poisoning over a period of 10 to 18 minutes or to die more quickly, but brutally, in the electric chair. As a personal choice, unique to him, Mr. Zagorski determined that a faster—if more gruesome—death was preferable to a slower and more painful one. Each of these methods of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment. Forcing Mr. Zagorski to choose between them violates the Eighth and Fourteenth Amendments.

Having been forced to make this cruel and unconstitutional choice, Mr. Zagorski waited for the State of Tennessee to carry out his execution. Paradoxically, while the lawyers for the State were suggesting in federal district court that necessary training and testing had not taken place, and that electrocution was not an option,[1] prison officials were, in fact, conducting that training and testing. On September 27, 2018, prison staff underwent training on performing an execution with the electric chair. According to media reports, on October 10, 2018, prison officials tested the electric chair.[2] What happened during that test is not yet known. However, at 4:00 p.m. on October 11, 2018, the day of Mr. Zagorski's scheduled execution, the Governor granted a reprieve to allow prison officials to properly prepare the electric chair. But for that reprieve, Mr. Zagorski would be dead today.

It has become clear that Tennessee lacks the ability and the proper apparatus to conduct an execution by electrocution. Fraudulent enginner of questionable judgment and dubious reasoning, Fred Leuchter, designed the electric chair that the State chose not to use on October 11, 2018—but intends to use on November 1, 2018. Past experience with Fred Leuchter's chair demonstrates that it will cause a gruesome death where the condemned's body will be horribly burned, and during which the condemned will experience severe pain, mental anguish and

---

[1] Defendant's Response to Plaintiffs' Motion for Temporary Restraining Order, 3:18-cv-01035, R. 8, PageID # 379.

[2] *See* https://www.wate.com/news/tennessee/state-prepares-electric-chair-execution-date-unconfirmed/1525153016 (last checked October 23, 2018 at 12:45 p.m.).

2

needless suffering. While, to Mr. Zagorski (if not necessarily to all others) the suffering from this horrifically contrived contraption will be less odious, and, hopefully of much shorter duration, than death by lethal injection, such a death is still utterly barbaric.

Compounding this barbarity will be Tennessee's efforts to prevent any judicial intervention. With the declared intent to prevent an attorney from contacting any court, the Defendants prohibit the single attorney observer from having access to a phone. Should anything go wrong with Mr. Zagorski's execution, his attorney will be required to convince a parade of guards and turnkeys to let them through a series of gates, so that the attorney can run to her car, and use a cell phone. In a best case, this journey will take seven minutes, in a worst case, much longer. Moreover, due to Tennessee's contempt for the condemned they are permitted only a single attorney observer, while the media has seven members present, and up to three friends of each of the deceased may be present as well.[3] It is clear that, in the event of a "botched" electrocution, for Mr. Zagorski to have any meaningful access to the courts, three things must be permitted: (1) two attorney observers (so one can remain in the room, while the second exits to call the court), (2) immediate access to a telephone, such as a cell phone immediately outside of the viewing room or access to an installed landline, and (3) the ability of the observer in the viewing room to pass information to the attorney on the phone.

---

[3] Mr. Zagorski has no objection to the number of other observers and is not suggesting they should be reduced. Friends and family of the deceased should certainly have the opportunity to be present.

3

Forcing Mr. Zagorski to choose death in Leuchter's electric chair is cruel and unusual and violates due process. Executing Mr. Zagorski in the electric chair is cruel and unusual. Tennessee's cynical restrictions on access to the courts are patently unconstitutional.

However, it must be said: should this suit fail and should Mr. Zagorski be killed on November 1, 2018 (or at some later date), he will stand by his coerced choice to select the electric chair over the three-drug, midazolam-based, lethal injection protocol. He is sincere, and he is committed, he believes the three-drug protocol will inflict a death so horrible that he would prefer to die by electrocution.

## OUTLINE OF CLAIMS

1. This suit is filed because the State of Tennessee has coerced Mr. Zagorski—with the threat of extreme chemical torture via a barbaric three-drug lethal injection protocol—to choose to die a painful and gruesome death in the electric chair. Such a death is clearly cruel and unusual, albeit to Mr. Zagorski less cruel than the threatened chemical torture. This coerced choice to choose a death by electrocution violates the Eighth and Fourteenth Amendments.

2. This suit is also filed, in light of Tennessee's reticence to proceed with electrocution on October 11, 2018, despite having undertaken testing of the electric chair. It has become clear that Tennessee's electric chair is incompetently designed and will inflict severe pain, mental anguish and needless suffering as it burns Mr. Zagorski's skin from his skull, boils his blood and fails to promptly stop his heart and brain function. Use of Tennessee's electric chair is cruel and unusual in

4

violation of the Eighth Amendment.

3. Finally, this suit is filed so that Mr. Zagorski's last constitutional rights may be respected, and so that he, through counsel, can have meaningful access to the courts. The Fourteenth Amendment requires no less.

4. Mr. Zagorski requests that this Court issue a temporary restraining order and preliminary injunction enjoining the State of Tennessee from executing him under either presently authorized method.

5. Mr. Zagorski further requests that this Court issue a temporary restraining order and preliminary injunction enjoining the State of Tennessee from executing him under any method, whatsoever, unless he is afforded meaningful access to the courts during his execution, including the presence of two-attorney observers who have immediate telephone access and the ability to communicate with one another.

## PARTIES

6. Plaintiff Edmond Zagorski is a condemned inmate residing at Riverbend Maximum Security Institution (RMSI), Nashville, Davidson County, Tennessee. He is scheduled to be executed on November 1, 2018.

7. Defendant Bill Haslam is the Governor of the State of Tennessee. Mr. Zagorski sues Governor Haslam in his official capacity.

8. Defendant Tony Parker is the Commissioner of the Tennessee Department of Correction. Mr. Zagorski sues Mr. Parker in his official capacity.

9. Defendant Tony Mays is the Warden of RMSI. Mr. Zagorski sues Mr. Mays in his official capacity.

## VENUE

10.    In this action, Mr. Zagorski seeks injunctive relief pursuant to 42 U.S.C. § 1983.

11.    As Mr. Zagorski's § 1983 claims arises from a federal statute, this Court has jurisdiction over it pursuant to 28 U.S.C. § 1331.

12.    Venue is proper in Tennessee's middle district because the injury Mr. Zagorski seeks to prevent would occur here. 28 U.S.C. § 1391.

## RELEVANT FACTS

13.    On March 2, 1984, a jury found Edmund George Zagorski guilty of two counts of first degree murder.  Following a brief sentencing phase, the jury found that no mitigating circumstances outweighed two aggravating circumstances and that he should be sentenced to death.  Immediately thereafter, the Honorable Fred Kelly pronounced "the judgment of this Court that you shall be sentenced to death by electrocution."

14.    At the time of Mr. Zagorski's crimes, trial, and conviction, electrocution was the only statutory means of imposing the death penalty in Tennessee. Tenn. Code Ann. § 40-23-114.

15.    In 1998, the Tennessee legislature amended the death penalty statute to permit an inmate sentenced to death by electrocution to choose to die by lethal injection. Pub. Ch. 982 (approved May 18, 1998).

16.    In 2000, the Tennessee legislature amended the death penalty statute to make death by lethal injection the default method of execution for all condemned inmates,

6

while permitting inmates to choose to die by electrocution. Pub. Ch. 614 (approved March 30, 2000).

17.   As presently enacted, the death penalty statute provides:

> Any person who commits an offense prior to January 1, 1999, for which the person is sentenced to the punishment of death may elect to be executed by electrocution by signing a written waiver waiving the right to be executed by lethal injection.

Tenn. Code Ann. § 40-23-114(b).

     **a.   An abbreviated history of lethal injection in Tennessee, and the problems presented by the present three-drug method that does not use an anesthetic and will leave an inmate sensate and aware when he is injected with the second two drugs, and which will cause pulmonary edema.**

18.   Tennessee originally used a three-drug protocol that relied upon sodium thiopental to render an inmate insensate.  Under this protocol "it was undisputed that the injection of Pavulon [a paralytic] and potassium chloride would alone cause extreme pain and suffering." *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 307 (Tenn. 2005).  However, this was not cruel and unusual, because "all of the medical experts...agreed that a dosage of five grams of sodium Pentothal...causes nearly immediate unconsciousness....and an inmate would be unconscious in about five seconds...and would feel no pain prior to dying." *Id.* at 307-08.

19.   A later version of Tennessee's Lethal Injection Protocol called for the administration of one drug—pentobarbital. Tennessee courts held that pentobarbital "if administered properly, will likely cause death with minimal pain and with quick loss of consciousness." *West v. Schofield*, 519 S.W.3d 550, 562 (Tenn. 2017).

20.   On January 8, 2018, the Defendants amended their Lethal Injection Protocol,

7

leaving single-drug pentobarbital as "Protocol A" and adding a three-drug cocktail as "Protocol B." The three-drug cocktail consists of midazolam, a sedative-hypnotic (a drug that reduces anxiety and brings about sleep), vecuronium bromide (a paralytic) and potassium chloride (a depolarizing drug that will stop the heart and cause death). The three-drug protocol does not contain any analgesic medications (drugs that prevent pain), nor does it contain a drug capable of bringing a person to a state where they are insensate to pain.

21.    On February 20, 2018, Mr. Zagorski and thirty-two other plaintiffs filed suit in Davidson County Chancery Court challenging the constitutionality of the midazolam-based three-drug protocol. *Abdur'Rahman, et. al. v. Parker, et. al*, 18-183-II.

22.    On March 15, 2018, the Tennessee Supreme Court *sua sponte* scheduled Mr. Zagorski's execution for October 11, 2018. *State v. Zagorski*, No. M1996-00110-SC-DPE-DD, (Tenn. March 15, 2018 Order setting execution date).

23.    On July 5, 2018, four days before trial, Tennessee amended its lethal injection protocol by removing altogether Protocol A—the single dose of pentobarbital—leaving the three-drug midazolam protocol as the only method of lethal injection in Tennessee's protocol.

24.    On July 9, 2018, less than five months after the filing of the original complaint, trial began on Mr. Zagorski's constitutional challenge. From July 9 through July 24, 2018—over ten trial days—the Chancellor heard testimony from six expert witnesses, eleven witnesses to execution, and three representatives of the State of Tennessee.

8

The parties introduced 151 exhibits.[4]

25.     Mr. Zagorski's position in that litigation and sincerely-held personal belief—based on the science and proof developed at trial, as well as the Chancery Court's ultimate findings on July 26, 2018—is that the three-drug midazolam protocol will cause severe pain, mental anguish, and needless suffering that rises to the level of torture.   Scientific and lay proof establishes that if he is executed in this manner, midazolam will be inadequate to protect him from the severe pain and mental anguish that is certain to occur. He will needlessly suffer.

26.     Scientific proof at trial established that midazolam does not possess analgesic properties (it does not protect against pain), and it is not a general anesthetic capable of lowering a person's awareness to such a level that they are insensate to pain.

27.     As the trial evidence showed, an inmate in a midazolam execution will suffer first from the injection of 100 ml of pH 3.0 acidic midazolam, which will cause pulmonary edema. His lungs will begin to fill with fluid, and he will struggle to breathe. This produces severe pain, mental anguish, and needless suffering.

28.     As the pulmonary edema commences, an insufficiently trained prison warden will wait for three minutes and then pinch the inmate's shoulder (insofar as it can be

---

[4] The pace of this litigation was brutal: In less than seven months, the case moved from the initial complaint (February 20, 2018), to the Tennessee Supreme Court's final opinion (October 8, 2018). Along the way, Mr. Zagorski and other inmates filed two amendments to the complaint, secured four experts and eleven eye-witnesses, took nine depositions (from Tulsa, Oklahoma to Boston, Massachusetts, with stops in Miami, Atlanta and Auburn as well), conducted ten days of trial, and prosecuted a full appeal on a 15,000+ page record.

9

reached underneath the web of straps pinning the inmate to the gurney), in a vain attempt to assess "consciousness." The relevant issue should be whether an inmate will be sensate to the extreme pain and suffering of pulmonary edema, paralysis, suffocation, air hunger and chemical burning that the protocol entails. But, the untrained warden's assessment does not involve any corollary to those noxious stimuli—just a pinch.

29.    Ed Zagorski is a well-developed man, who while last on death watch, from October 9 to 11, 2018, did 12,001 push-ups (the guards who counted for him, have verified this). Pinching his shoulder would not produce any pain. Thus, the warden would be completely incapable, in light of his limited training, the extreme restraints that are used, the inadequacy of the method, and Mr. Zagorski's particular musculature, of making any assessment of whether Mr. Zagorski is sensate to pain.[5]

30.    If the warden fails to observe any signs of "consciousness," the executioner will inject the inmate with vecuronium bromide, which will paralyze the inmate's face, extremities, arms, and then lungs. This will cause the inmate extreme panic and distress, as he hungers for air.

31.    During Tennessee's only prior execution using this method, that of Billy Ray Irick, the Defendants chose not to prepare the backup dose of midazolam, as required by their protocol. Thus, had the warden determined that Mr. Irick was "conscious,"

---

[5] As Mr. Zagorski does not wish to die in this method, he is not suggesting that a superior consciousness check could be designed for him—rather, this is shared to illustrate the inherent failure of Tennessee's lethal injection plan.

there was no additional midazolam available. This indicates that the defendants' "consciousness check" is a sham designed entirely for show (and for the courts).[6]

32.     The inmate will remain paralyzed, with his lungs filling with fluid, unable to breathe, for at least two minutes, until a final injection of potassium chloride causes him excruciating pain, as it "ignites" every nerve fiber in his body.

33.     30-45 seconds after the pain of potassium chloride begins, the inmate's heart will stop, and shortly thereafter he will lose consciousness and die. Death from potassium chloride is inevitable and certain.

34.     During Tennessee's single prior execution using this method, Billy Ray Irick gasped for breath, coughed, and strained against his restraints, prior to the on-set of vecuronium bromide paralysis. He was clearly sensate to pain, and suffering from pulmonary edema. The degree of suffering he felt from air hunger, total paralysis and the chemical burning of potassium chloride cannot be known, but was certainly severe and horrific.

35.     According to the Chancellor who presided over the lethal injection trial, this "dreadful and grim" execution will take between 10 and 18 minutes.

36.     On July 26, 2018, two days after the conclusion of the trial, the Chancery Court ruled against the inmates. *Id.*

37.     On July 30, 3018, Mr. Zagorski and the other inmates promptly appealed that decision.

---

[6] In earlier litigation before Chancellor Bonnyman, the three drug protocol was originally found unconstitutional, but after Tennessee adopted a consciousness check it was upheld.

11

38.    On August 9, 2018, after the Tennessee and United States Supreme Court's denied his requests for a stay, over strenuous dissents in both courts, the State executed Billy Ray Irick, as has been described above. In conducting this first execution, the defendants chose not to follow their own protocol. Instead of preparing the drugs ahead of time—as the protocol required—the first dose of midazolam was prepared at 7:28 p.m., 28 minutes after Mr. Irick's execution was set to commence. As noted, above, prison officials never prepared the back-up dose of midazolam, which was required under the protocol, and was to be used if the untrained warden detected signs of "consciousness."

39.    On August 13, 2018, the Tennessee Supreme Court reached down to take jurisdiction from the Court of Appeals *sua sponte*, and set an expedited timeline for the appeals process. *Abdur'Rahman, et. al. v. Parker, et. al*, M2018-01385-SC-RDO-CV (Tenn. July 26, 2018 Order and dissenting opinion). Following an expedited briefing schedule, the Court heard oral argument on October 3, 2018.

40.    On October 8, 2018, three days prior to Mr. Zagorski's originally scheduled execution, the Tennessee Supreme Court upheld the three-drug protocol as constitutional solely based on their finding that plaintiffs did not properly plead a two-drug alternative, and failed to prove a one-drug alternative. *Abdur'Rahman v. Parker*, -- S.W.3d --, 2018 WL 4858002, *13 (Tenn. October 8, 2018). The court explicitly declined to decide "whether the lethal injection protocol creates a demonstrated risk of severe pain." *Id.* at *14.

**b.** **The choice that Edmund Zagorsky was forced to make.**

41.    On August 30, 2018, counsel for Mr. Zagorski delivered a letter to the Warden of RMSI informing him that Mr. Zagorski was unable to choose a method of execution at that time, because the litigation regarding lethal injection was still ongoing and unresolved. This letter put the Warden and the State of Tennessee on notice that Mr. Zagorski was considering the option of electing death by electrocution.

42.    On September 27, 2018, Tennessee conducted its regular training to perform an execution in the electric chair.

43.    The Tennessee Supreme Court's decision to uphold lethal injection, on procedural grounds, was issued at approximately 4:00 p.m. on October 8, 2018. This decision made it nearly inevitable that, unless Mr. Zagorski acted, he would be killed with the three-drug protocol that he knew was certain to inflict severe pain, mental anguish, and needless suffering over 10 to 18 "dreadful and grim" minutes.

44.    Within two hours of the Tennessee Supreme Court's decision, Mr. Zagorski delivered to the RMSI Warden his election to be killed by the electric chair ("Affidavit Concerning Method of Execution"). He was coerced and compelled to make this decision, as it was his only avenue to protect himself from the certainty of prolonged and needless suffering under the three-drug protocol.

45.    Mr. Zagorski made the following statement in this election:

> By signing this affidavit I am not conceding that electrocution is constitutional. I believe that both lethal injection and electrocution violate my rights under the 8th amendment. However, if I am not granted a stay of execution by the courts, **as between two unconstitutional choices I choose electrocution. I do not waive my right to continue to appeal my challenge to lethal injection. And, if that appeal is successful, then I will challenge electrocution as**

13

**unconstitutional.** I am signing this document because I do not currently have a stay of execution and I do not want to be subjected to the torture of the current lethal injection method. **(emphasis** added).

46.     On October 9, 2018, the Deputy Commissioner of the Tennessee Department of Corrections, Debra K. Inglis, informed counsel for Mr. Zagorski that his election would not be honored, and he would be killed using the three-drug protocol

49.     On October 10, 2018, the day before his execution, Mr. Zagorski filed suit in the District Court for the Middle District of Tennessee to enjoin a three-drug execution and to permit him the unconstitutional, but less awful, alternative of death by electrocution. 3:18-cv-01035, R. 1.

50.     On October 10, 2018, prison officials tested the electric chair. https://www.wate.com/news/tennessee/state-prepares-electric-chair-execution-date-unconfirmed/1525153016 (last visited October 23, 2018 at 12:45 p.m.).

51.     On October 11, 2018, the Court issued a temporary restraining order enjoining Tennessee from executing Mr. Zagorski by lethal injection (but permitting execution in the electric chair). 3:18-cv-01035, R. 10.

52.     Following the injunction, the Governor of Tennessee, Defendant Bill Haslam, issued a 10-day reprieve. By press release, he indicated that this was done so that Tennessee could be prepared to use the electric chair.

53.     Mr. Zagorski does not know why Tennessee was not prepared to execute him by electrocution, despite having conducted training on September 27, 2018 and testing on October 10, 2018. Tennessee's inability to operate their own electric chair, causes him concern.

54.     If Tennessee had been capable of performing an execution in the electric chair on October 11, 2018, Mr. Zagorski would be dead. Although death by electrocution was and is cruel and unusual, Mr. Zagorski had insufficient time to perfect a new lawsuit to challenge that method. Indeed, he expected to be dead by the evening of October 11, 2018.

55.     On October 22, 2018, the Tennessee Supreme Court issued a new order setting Mr. Zagorski's execution for November 1, 2018.

> **c.     Facts Regarding Tennessee's Electric Chair and the certainty that it will inflict a gruesome, barbaric and torturous death.**

56.     In 2001, the Georgia Supreme Court declared that execution in the electric chair was unconstitutional, because of the attendant "specter of excruciating pain" and the "certainty of cooked brains and blistered bodies." *Dawson v. Georgia*, 554 S.E.2d 137, 144 (Ga. 2001).

57.     In 2008, the Nebraska Supreme Court declared that executions in the electric chair were unconstitutional, finding that it causes "intolerable pain." *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008).

> ... Electrocution as a method of executing condemned prisoners is an extremely violent method of accomplishing death. It includes some burning, smoke, and involves extreme contortion of muscles and tissue of almost every part of a person's body. It includes no effort at all to anesthetize the person into unconsciousness before the mechanisms of death are employed.
>
> ... [T]here is no question that the Nebraska practice of executing condemned prisoners exclusively by electrocution is unique, outdated, and rejected by virtually all the rest of the world; including practices for the euthanasia of non-human animals. There is also no question that its continued use will result in unnecessary pain, suffering, and torture for some, but not all of [the] condemned murderers in this state. Which ones

15

or how many will experience this gruesome form of death and suffer unnecessarily; and which ones will pass with little conscious suffering cannot be known.

*Id.* at 272.

58.     Further, the Nebraska Supreme Court credited the following trial court findings of fact:

> [The trial court] clearly found that some prisoners would remain conscious for 15 to 30 seconds or during the entire application of the current. . . . The evidence fully supports those findings and undercuts the State's theory of instantaneous death.

*Id.* at 272.

59.     The Nebraska Supreme Court concluded:

> Besides presenting a substantial risk of unnecessary pain, we conclude that electrocution is unnecessarily cruel in its purposeless infliction of physical violence and mutilation of the prisoner's body. Electrocution's proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity of man.

*Id.* at 279.

60.     Thus, there is no certainty that death under electrocution will be swift or that the inmate will be unaware. Although the period of an inmate's awareness during an electrocution may be much less than that under lethal injection, there is still a substantial risk of severe pain, mental anguish and needless suffering.

61.     Mr. Zagorski submits that scientific and lay testimony can and will verify the truth of the conclusions of the Georgia and Nebraska Supreme Courts: death in the electric chair will cause severe pain, mental anguish, and needless suffering, and it will cause mutilation of the human body through burning.   Moreover, as most relevant to this Complaint, the unique facts of Tennessee establish that execution in

16

Tennessee's electric chair will be exceptionally terrible.

62.     Fred A. Leuchter designed and manufactured the equipment Tennessee uses to execute prisoners by means of electrocution.

63.     On or around November 29, 1989, Leuchter installed the electrocution equipment he created at RMSI.

64.     Leuchter does not have, and never had, an electrical engineering license from any state. In fact, he lied about his lack of education and credentials for years, until the State of Massachusetts entered into a Consent Decree with him, whereby he agreed to cease and desist from making such claims.

65.     Leuchter's claimed expertise in scientific matters has been rejected by trained scientists in the fields in which he claims expertise. For example, Leuchter claimed that the absence of trace elements of lethal gas on bricks he stole from the WWII Auschwitz concentration camp constituted evidence that the Nazi's did not operate a gas chamber at the death camp. The scientific community has universally rejected his theory. Indeed, Massachusetts required that he stop distributing his Holocaust denial report, entitled "An Engineering Report on the Alleged Execution Gas Chambers at Auschwitz, Birkenau, and Majdanek."

66.     On or around April 16, 1994, Michael S. Morse tested the electrocution equipment Leuchter created. Morse opined that Leuchter's equipment did not deliver an adequate current to carry out an execution and did not have the capacity to do so. Morse made fourteen specific recommendations for modifications to Leuchter's electrocution equipment.

17

67.     On or around April 25, 1994, Jay Weichert tested the electrocution equipment Leuchter created. Weichert opined that Leuchter's equipment did not function properly. Weichert made seven specific recommendations for modifications to Leuchter's electrocution equipment.

68.     Tennessee made some, but not all, of the modifications Morse and Weichert suggested.[7]

69.     Defendants maintain the electrocution equipment in an Execution Chamber and Executioner's Room located within the RMSI.

70.     The Execution Chamber contains the Electric Chair.

71.     The component parts of the Electric Chair include: (a) a head piece (a leather cranial cap lined with copper mesh inside - hereafter sometimes referred to as the head electrode); (b) two leg electrodes; (c) a junction box located behind a back leg of the Electric Chair; (d) a cable that runs from the junction box to the head electrode; (e) two cables that run from the junction box to the leg electrodes; and, (f) a removable drip pan underneath a perforated seat.

72.     The Executioner's Room adjoins the Execution Chamber.

73.     The Executioner's Room contains: (a) an electrical console (the unit the

---

[7]     After Morse and Weichert suggested modifications to Leuchter's electrocution equipment, they examined Florida's electric chair. Weichert concluded that Florida's electrocution equipment "looks excellent." In a subsequent Florida electrocution, however, the condemned prisoner survived after the executioner shut off the chair's power, taking ten deep breaths before dying. Before a medical doctor declared the prisoner dead, blood poured out from under the sheath covering the prisoner's face, and blood on the prisoner's chest spread to the size of a dinner plate, oozing through the buckle holes on the chest straps that harnessed him to the electric chair.

Case 3:18-cv-01205   Document 1   Filed 10/26/18   Page 18 of 32 PageID #: 18

executioner manipulates to carry out an electrocution); (b) a transformer (the device that transfers electricity to and from the Electric Chair); (c) an amp meter (a device that measures the number of amps in an electrical current); and, (d) a switch for activating an exhaust fan above the Electric Chair.

74.    In preparing to activate the Electric Chair, Defendants connect a low voltage cable from the electrical console to the transformer and a high voltage cable from the transformer to the Electric Chair's junction box.

75.    When activated, the transformer and the Electric Chair create an open alternating current electrical circuit. Any object that creates a connection between the head electrode and the leg electrodes closes, and becomes part of, the electrical circuit. That current traveling that circuit will alternate, or reverse direction, sixty times per second (60 HZ).

76.    The Tennessee Protocol for Execution Procedures For Electrocution provides that Defendants' electrocution equipment is designed to deliver to a prisoner for twenty seconds an alternating current of 1,750 volts at 7 amps, followed by a pause of fifteen seconds, followed by a fifteen second alternating current of 1,750 volts at 7 amps.

77.    Defendants use a Test Load Box when they test the electrocution equipment.

78.    The purpose of the Test Load Box is to simulate a prisoner's body.

79.    Defendants place the Test Load Box in the Electric Chair's perforated seat and connect it to the power cable for the head electrode and the leg electrodes.

80.    After connecting the Test Load Box to the power cable for the head electrode

19

and the leg electrodes, Defendants activate the Electric Chair and check to see if the transformer meter reads 1,750 volts and the amperage meter reads 7 amps.

81.    Ohm's Law establishes that for the electrocution equipment to maintain a circuit that delivers a current of 1,750 volts at 7 amps, the circuit must provide 250 ohms of resistance. (1,750 (volts)/7 (amps) = 250 (ohms)).

82.    Defendants' testing procedure establishes only that when the Test Load Box is used to complete the circuit containing the Electric Chair, the Test Load Box provides resistance that creates a total circuit resistance of 250 ohms.

83.    Defendants' testing procedure fails to establish that the electrocution equipment will maintain during the electrocution of a prisoner a circuit that delivers a current of 1,750 volts at 7 amps to the prisoner because:

   a. For testing purposes, Defendants attach a tester lead from the Test Load Box directly to the power cable for the head electrode. During an execution, however, Defendants: (a) attach the power cable for the head electrode to the head piece; (b) put a sponge saturated with salt water on the prisoner's head; and, (c) attach the head piece to the prisoner's sponge-covered head. The interface between the head electrode/sponge and scalp of the prisoner's head presents a region of high electrical resistance unaccounted for in Defendants' testing procedure.

   b. While the Test Load Box contains constant material and thereby reliably provides a constant resistance that creates a total circuit resistance of 250 ohms, the electrical resistance of human bodies varies widely. Factors affecting an individual's resistance to an electrical current include, but are not limited to: (a) the presence or absence of fatty tissue beneath his skin; (b) the distribution and activity of sweat glands; (c) the amount of oil in and on his skin; (d) the thickness of his skin; (e) the amount of hair on his body; (f) the thickness of his skull; (g) the location and size of any cranial skull fissures; and, (h) regional blood flow at the time of electrocution.

   c. As a consequence of these factors, a prisoner's body may create a circuit resistance significantly higher or lower than the 250 ohm circuit resistance the Test Load Box creates and thereby significantly alter the voltage and/or current that Defendants apply to him.

20

      d. Defendants make no effort to investigate the resistance individual prisoners present to electrical current.

84. When the Electric Chair is activated, the transformer sends electrical current through the head electrode/sponge and onto the prisoner's head. The current exits the prisoner's body at the leg electrodes and travels back to the transformer, completing a circuit. The current alternates between traveling this direction and the opposite direction sixty times per second.

85. While conditions remain constant within the Test Load Box throughout the testing procedure, during an electrocution execution the resistance of the prisoner's body changes dramatically as his skin heats, perforates, vaporizes, burns, and chars and the saline solution in the sponges between the prisoner's body and the electrodes heats and vaporizes.

86. Defendants' testing procedure fails to ensure that the electrocution equipment will minimize the pain it inflicts on a prisoner because:

      a. Individual prisoners have different thresholds for the sensation of electrical current.

      b. Individual prisoners have different thresholds for the perception of pain.

      c. Individual prisoners experience different physiological effects to electrical current.

      d. Individual prisoners will experience significant differences in the amount of electrical current required, and the amount of time for application of that current, to cause unconsciousness.

87. No state currently mandates electrocution as the primary method of carrying out judicial executions.

      a. In 1974 electrocution was the sole method of execution in Alabama, Arkansas, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Nebraska, New Jersey, New York, Ohio, Pennsylvania,

21

South Carolina, South Dakota, Tennessee, Texas, and Virginia.

b.  In 1977 Texas abandoned electrocution. Tex. Crim. Proc. Code Ann. § 43.14.

c.  In 1982 New Jersey abandoned electrocution. N.J. Stat. Ann. § 2C:49-2.

d.  In 1983 Illinois abandoned electrocution. 725 Ill. Comp. Stat. 5/115-5.

e.  In 1983 Arkansas abandoned electrocution as an imposed method of execution. Arkansas gave prisoners sentenced to death before July 4, 1983, the ability to avoid electrocution by choosing instead lethal injection or lethal gas. Arkansas abandoned electrocution as an execution method for prisoners sentenced to death after that date. Ark. Code Ann. § 5-4-617.

f.  In 1984 South Dakota abandoned electrocution. S.D. Codified Laws § 23-A-27A-32.

g.  In 1990 Louisiana abandoned electrocution. La. Rev. State. Ann. § 15:569.

h.  In 1993 Ohio abandoned electrocution as an imposed method of execution. Ohio gave prisoners the ability to avoid electrocution by choosing instead lethal injection. Ohio Rev. Code Ann. § 2949.22.

i.  In 1994 New York abandoned electrocution. N.Y. Correct. Law § 658.

j.  In 1994 Connecticut abandoned electrocution. Conn. Gen. Stat. § 54-100.

k.  In 1994 Virginia abandoned electrocution as an imposed method of execution. Virginia gave prisoners the ability to avoid electrocution by choosing instead lethal injection. Va. Code Ann. §§ 53.1-233, 53.1-234.[8]

l.  In 1995 Indiana abandoned electrocution. Ind. Code Ann. § 35-38-6-1.

m.  In 1995 South Carolina abandoned electrocution as an imposed method of execution. South Carolina gave prisoners the ability to avoid electrocution by choosing instead lethal injection. S.C. Code Ann. § 24-

---

[8]"Electrocution is a violent, torturous and dehumanizing act. Carrying out executions should not require the state to stoop to the same level as the criminal. The objective is death, not violent torture." (Statement of Senator Edgar Robb). "[Electrocution is] a violent, torturous and, yes, dehumanizing way of carrying out the mandate of the people." (Statement of Delegate Phillip Hamilton).

3-530.[9]

n.  In 1998 Kentucky abandoned electrocution as an imposed method of execution. Kentucky gave prisoners sentenced to death on or before March 31, 1998, the ability to avoid electrocution by choosing instead lethal injection. Kentucky abandoned electrocution as an execution method for prisoners sentenced to death after that date. Ky. Rev. Stat. Ann. § 431.220.

o.  In 1998 Pennsylvania abandoned electrocution. Pa. Stat. Ann. Tit. 61, § 3004.

p.  In 1998 Tennessee abandoned electrocution as an imposed method of execution. Tennessee gave prisoners sentenced to death before January 1, 1999, the ability to avoid electrocution by choosing instead lethal injection, with the default execution method being electrocution if the prisoner refused to select an execution method. Tennessee abandoned electrocution as an execution method for prisoners sentenced to death after that date. In 2000, Tennessee abandoned electrocution as the default execution method for prisoner sentenced to death before January 1, 1999. Tenn. Code Ann. § 40-23-114(a).[10]

q.  In 2000 Florida abandoned electrocution as an imposed method of execution. Florida gave prisoners the ability to avoid electrocution by choosing instead lethal injection. Fla. Stat. Ann. §§ 922.10 and 922.105.

r.  In 2000 Georgia abandoned electrocution as a method for executing future death sentences, but left electrocution in place as the method for prisoners sentenced to death before the new legislation took effect. Ga. Code Ann. § 17-10-38.

s.  In 2001, the Georgia Supreme Court declared electrocution a cruel and unusual punishment. *Dawson v. State*, 554 S.E.2d 137, 143-44 (Ga. 2001).

t.  In 2001 Ohio abandoned electrocution.[11]

---

[9] "The technology that was available for us at the turn of the century in South Carolina was electricity. . . . It's kind of cruel and inhumane." (Statement of Representative Harry Hallman).

[10] "We have reason to be very suspect of the technology of our Electric Chair, the maintenance of our Electric Chair, modifications that have been performed to the Electric Chair, as to whether or not this is actually gonna result in a death that would be quite heinous and cruel. . . ." (Statement of Representative Frank Buck).

[11] "Electrocution is no longer a humane way of putting condemned prisoners to death. . . ." (Representative Jim Trakas).

23

u.   In 2002 Alabama abandoned electrocution as an imposed method of execution. Alabama gave prisoners the ability to avoid electrocution by choosing instead lethal injection. Ala. Code § 15-18-82.[12]

v.   In 2008 the Nebraska Supreme Court declared electrocution a cruel and unusual punishment. *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008).

88.   Electrocution is simply not used as a means of execution by any state, the federal government, or any other nation in the world.

89.   Although Mr. Zagorski challenges only Tennessee's electrocution protocol, the following is true of all state killings by electrocution, as attested to by Dr. John P. Wiksco, Jr., who holds a Ph.D. in Physics from Stanford University, is the Founding Director of the Vanderbilt Institute for Integrative Biosystems Research and Education, and has been researching judicial electrocution protocols and electrocution equipment since 1992:

(1) prisoners can remain alive for some period of time during the electrocution for various reasons: the heart may not stop immediately when the current contacts the body; if the heart does stop, it may start again when the current ceases; this fibrillation over time during the electrocution will gradually reduce cardiac output until it is insufficient to maintain life; the electrical current causes the skeletal muscles required for breathing to tetanize (i.e., contract or spasm), such that the prisoner dies of asphyxiation; and/or organ damage as a result of thermal heating (i.e., cooking) produces death gradually,

(2) prisoners may remain conscious and sensate for some period of time during the electrocution: the skull somewhat protects the brain by providing greater resistance than the skin, so that the current will primarily travel down the perimeter of the head, down the torso and legs, until it leaves through the leg electrodes,

---

[12]"[Electrocution is a] horrible way for us to put a person to death." (Statement of Representative Thomas Jackson).

24

(3) because prisoners can remain alive, conscious, and sensate during at least a portion of the duration of a judicial electrocution event, for numerous reasons they can experience excruciating pain and suffering during the event: the high-voltage electrical current produces severe burns; the current thermally heats (i.e., cooks) the body and internal organs; the current directly excites most if not all nerves along its path; the current excites some brain neurons causing extreme pain as well as sensations of sound, light, dread, and fear; the current tetanizes all muscles simultaneously; the tetanized breathing muscles cause the sensation of suffocating; time perception may be altered such that the prisoner experiences each cycle of current and/or perceives the electrical trauma as lasting dramatically longer than it would appear to a bystander;

(4) because contact with high voltage electrical current causes muscles to malfunction and because Tennessee inmates are harnessed tightly onto the electrocution equipment, a prisoner is unable to signal that he is experiencing pain and suffering during an electrocution execution;

(5) because of the unpredictability and variability of each prisoner's electrical resistance and that of the connections to his body during an electrocution execution, the current delivered to each prisoner will vary significantly from the currents delivered to other prisoners, such that the time an individual prisoner will remain alive, conscious, and sensate are unknown and will vary substantially from prisoner to prisoner;

(6) because prisoners can remain alive at the end of an electrocution execution and the medical doctor waits five minutes before examining the body for signs of life, an inmate who survives the electrocution process will die from thermal heating (cooking of their vital organs) and asphyxiation during this time, *id. See also id.* at 1 (detailing the nature of Dr. Wisksow's research and the bases for his conclusions).

90. Regarding Tennessee's use of Leuchter's electric chair, Dr. Wikswo reviewed various records and documents, including an autopsy of Daryl Holton, who Tennessee executed by electrocution in 2007, color photographs of Mr. Holton's body and other items associated with his execution, and newspaper accounts of Mr. Holton's execution. Dr. Wikswo's expert opinion is that Leuchter's chair will cause

25

excruciating pain, the likelihood of lingering death, and disfigurement of the body attendant to death by electrocution. In particular, the initial 20 second application of electrical current will not provide a long enough time for a prisoner to die because (1) it will not necessarily stop the heart, and (2) when the current stops and the skeletal muscles needed for respiration relax  air will flow into the prisoner's lungs. During the 15 second "disengage period," a prisoner's heart can circulate the newly oxygenated blood to the brain and the rest of the prisoner's body, keeping him alive, possibly conscious, and possibly sensate for the second application of electrical current. Dr. Wikswo details the gruesome conclusions from the autopsy, photographs, and media accounts of Mr. Holton's death, including severe thermal burns all over his body. He also notes superficial blunt force injuries and abrasions to Mr. Holton's scalp, forehead, chin, foot, upper arms, and calf, which are consistent with the witness reports of the prisoner jerking against the straps and electrodes after application of the electric current and the resulting muscle contraction and tetany. Dr. Wikswo

> conclude[s] to a reasonable degree of scientific certainty that there is a substantial risk that a prisoner electrocuted using Tennessee's Electrocution Protocol and electrocution equipment will remain alive, conscious, and sensate for some period of time during the electrocution process and, as a result, will experience for some period of time the excruciating pain and suffering associated with the phenomena that occur when a high voltage electrical current contacts a human being.

91.    Despite training on September 27, 2018 and testing on October 10, 2018, the Tennessee electric chair, designed and installed by Fred Leuchter, was not capable of use on October 11, 2018.

92.    If an electric chair exists, which can bring about quick unconsciousness and

26

Case 3:18-cv-01205   Document 1   Filed 10/26/18   Page 26 of 32 PageID #: 26

then death, such a chair is not possessed by Tennessee. Tennessee's electric chair will inevitably inflict severe pain, mental anguish and needless suffering on Edmund Zagorsk, just as it did on Darryl Holton before him.

### d. Facts concerning Defendants' denial of access to courts and counsel during executions

93.     Tennessee statute strictly limits the witnesses who are permitted to view an execution. Tenn. Code. Ann. § 40-23-116. Among others who are permitted are all immediate family members of the victim who are over age 18, or up to three personal friends, if there are not any immediate family members. Tenn. Code Ann. § 40-23-116(a)(7). Seven members of the media are permitted. Tenn. Code Ann. § 40-23-116(a)(6). Yet only a single "defense counsel chosen by the condemned person" is permitted. Tenn. Code Ann. § 40-23-116(a)(8).

94.     Tennessee prohibits the single defense counsel from bringing a cell phone or other communication device with them. Cell phones work inside the prison. They are carried and used by high-level officials.

95.     Landline phones are available and/or can be connected to the area outside of the viewing room (or inside the viewing room).

96.     The single defense counsel allowed to be present is not permitted to have any other support staff, or fellow attorneys on the campus, or even in the parking lot of the prison.

97.     If the single defense counsel wishes to communicate with a court, or their office, about what is taking place during the execution, they must leave the execution chamber (which requires a guard to unlock the door). They must go through multiple

27

locked "sally ports" and gates, each requiring a guard to open (whether directly, or remotely). After five to ten minutes, the single defense counsel may reach the lobby of the prison, and then run to their car as fast they can to access their cell phone. Should any guard or gatekeeper delay or deny passage, the process will take much longer.

98.     When asked the reason for the refusal to allow defense counsel access to a telephone during the July 2018 state-court lethal injection trial, TDOC General Counsel Debbie Inglis responded with startling honesty that TDOC does not want lawyers to call courts and provide information that might disrupt an execution.

99.     For Mr. Zagorski to have adequate access to courts, it is essential that he have two attorney-witnesses present. A cell phone or landline phone needs to be available immediately outside of the viewing room. If one of the attorneys leaves to use that phone, the second attorney must be allowed to communicate with them, so that they can inform the court of the current conditions in the execution chamber.

100.     Should Mr. Zagorski be executed in the electric chair, and should the chair fail to render him unconscious, while his body catches fire, his organs are cooked, and his blood boils, his single attorney will not be able to meaningfully seek judicial intervention, due to the unreasonable restrictions the defendants place on his defense counsel.

28

## CAUSES OF ACTION

### COUNT I
### Eighth and Fourteenth Amendments
### (Tennessee has coerced Edmund Zagorski to choose a cruel and unusual method of punishment by threatening him with torture, in violation of the Eighth and Fourteenth Amendments)

101.　Mr. Zagorski incorporates all preceding paragraphs.

102.　It violates the Eighth and Fourteenth Amendments to force Mr. Zagorski to choose between two cruel and unusual punishments; as the United States Supreme Court has long held, a citizen cannot be placed "between the rock and the whirlpool." Here, the Scylla of Leuchter's chair and the Charybdis of midazolam poisoning are both constitutionally unacceptable forms of execution.

103.　Both methods of execution are certain to cause severe pain, mental anguish, and needless suffering. Both methods rise to the level of torture and a barbaric punishment that cannot be permitted under the Eighth Amendment.

104.　Requiring that Mr. Zagorski choose between two abominable methods of death, and by so choosing, "waive" a challenge to the constitutionality of his "preferred" way of dying, violates the "unconstitutional conditions doctrine."

105.　Mr. Zagorski cannot be compelled to abandon his Eighth Amendment Right not to be tortured and disfigured in the electric chair, by the State's threat to torture him for 10 to 18 minutes on the lethal injection gurney. Tennessee's use of such coercive force leaves Mr. Zagorski no choice at all.

106.　The State of Tennessee cannot cloak unconstitutional punishments in the

29

mantle of choice.

107.   By threatening Edmund Zagorski with 10 to 18 minutes of dreadful and grim torture, so as to coerce him to select a gruesome and painful death in the electric chair, the State of Tennessee has violated his rights under the Eighth and Fourteenth Amendments.

## COUNT II
### Eighth and Fourteenth Amendments
### (Death by electrocution in Tennessee's electric chair is cruel and unusual punishment)

108.   Mr. Zagorski incorporates all preceding paragraphs.

109.   Execution in Tennessee's electric chair, under Tennessee's electrocution protocol, violates the Eighth Amendment's prohibition on cruel and unusual punishment.

110.   Execution in Tennessee's electric chair is barbaric and mutilates the prisoner's body, offending the dignity of the prisoner and society.

111.   Execution in Tennessee's electric chair inflicts unnecessary physical pain and psychological suffering. It violates evolving standards of decency.

112.   Execution in Tennessee's electric chair violates the Eighth Amendment to the United States Constitution.

30

## COUNT III
### First, Eighth, and Fourteenth Amendments
**(Tennessee violates Mr. Zagorski's rights to access to courts and counsel by prohibiting more than one attorney to be present at an execution and refusing to allow his counsel to have access to a telephone during his execution.)**

113.    Mr. Zagorski incorporates all preceding paragraphs.

114.    Tenn.Code Ann. § 40-23-116 unconstitutionally limits Mr. Zagorski's access to the courts by arbitrarily limiting him to a single attorney-witness in violation of the First, Eighth, and Fourteenth Amendments

115.    Defendants' refusal to allow Mr. Zagorski to have more than one attorney present at his execution, and for his counsel to have access to a telephone during his execution violates his right of access to courts and his right to counsel as secured by the First, Eighth, and Fourteenth Amendments.

116.    The defendants through statute and policy collectively deny Mr. Zagorski his constitutional right to access the courts, should the need arise, during his execution, in violation of the First, Eighth, and Fourteenth Amendments.

### **PRAYER FOR RELIEF**

Mr. Zagorski, respectfully requests that this Court:

1) Enjoin the Defendants from executing Mr. Zagorski using either the three-drug lethal injection protocol or the electric chair,

2)    Enjoin the Defendants from executing Mr. Zagorski in any manner, unless he is provided the right to two attorney-witnesses, who have immediate telephone access, and an ability to communicate between themselves,

3)    Declare Tenn.Code Ann. §40-23-116 unconstitutional, in that it acts to

31

deny Mr. Zagorski access to the courts and right to counsel, and

4)  Order such other relief as this Court deems just,

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC
DEFENDER FOR THE MIDDLE DISTRICT
OF TENNESSEE

KELLEY J. HENRY, BPR#21113
Supervisory Asst. Federal Public Defender
AMY D. HARWELL, BPR#18691
Asst. Chief, Capital Habeas Unit
RICHARD L. TENNENT,BPR# 16931
KATHERINE DIX, BPR#022778
JAMES O. MARTIN, III BPR#18104
810 Broadway, Suite 200
Nashville, TN 37203
Phone: (615) 736-5047
Fax: (615) 736-5265

BY:  *Kelley J. Henry by permission*
Counsel for Edmond Zagorski

## CERTIFICATE OF SERIVCE

I, Kelley J. Henry, hereby certify that a true and correct copy of the foregoing document was electronically filed and sent to the following via email on this the 6th day of September, 2018, to:

Andree Blumstein
Solicitor General

Jennifer Smith
Asst. Solicitor General
P.O. Box 20207
Nashville, TN 37202-0207

*Kelley J. Henry by permission*
Kelley J. Henry
Supervisory Asst. Federal Public Defender

32