IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| EDMOND ZAGORSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v | ) | No.   3:18-cv-1205 |
| | ) | Judge Trauger |
| | ) | |
| BILL HASLAM, in his official capacities | ) | |
| as GOVERNOR; | ) | DEATH PENALTY CASE |
| | ) | |
| TONY PARKER, in his official capacities | ) | EXECUTION DATE 11/1/18 |
| as COMMISSIONER; and | ) | at 7:00 p.m. |
| | ) | |
| TONY MAYS, in his official capacities | ) | |
| as WARDEN, Riverbend Maximum | ) | |
| Security Prison. | ) | |

MOTION TO ALTER OR AMEND ORDER DISMISSING COUNTS I AND II OF
THE COMPLAINT AND
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT[1]

Part One:  Motion to Reconsider

Plaintiffs moves this Court to reconsider its order dismissing counts I and II

of the complaint pursuant to Rule 59(e) of the Federal Rules of Civil Procedure

because the Court's order contains errors of law and fact.

---

[1] Due to the urgent nature of this motion, Mr. Zagorski requests the Court to
suspend the local rules regarding the form of pleadings and accept this omnibus
filing. Mr. Zagorski suggests that such action is necessary and will in fact aid the
Court by streamlining the litigation.

1

I. **The Court's order that Count I of the complaint is barred by collateral estoppel is legally and factually in error.**

   a. **Collateral estoppel: the essential elements.**

Collateral estoppel, also known as issue preclusion, bars the subsequent relitigation between the same parties of a fact or issue where that fact or issue was fully litigated in a previous case. *Cincinnati Ins. Co. v. Beazer Homes Invest., LLC,* 594 F.3d 441, 444–45 (6th Cir.2010); *St. Thomas Hosp. v. Sebelius,* 705 F. Supp. 2d 905, 915 (M.D. Tenn. 2010). Under the law of our circuit, "[f]our specific requirements must be met before collateral estoppel may be applied to bar litigation of an issue:

> (1) the precise issue must have been raised and actually litigated in the prior proceedings;
> (2) the determination of the issue must have been necessary to the outcome of the prior proceedings;
> (3) the prior proceedings must have resulted in a final judgment on the merits; and
> (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding."

*St. Thomas Hosp.,* 705 F.Supp2d at 915 (citing *Cobbins v. Tenn. Dept. of Transp.,* 566 F.3d 582, 589–90 (6th Cir.2009)).

The Tennessee law of collateral estoppel is substantively identical to Sixth Circuit precedent; it merely divides the first element of federal precedent into two separate considerations:

> To prevail with a collateral estoppel claim, the party asserting it must demonstrate
> (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding,

Case 3:18-cv-01205   Document 9   Filed 10/28/18   Page 2 of 39 PageID #: 53

(2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding,

(3) that the judgment in the earlier proceeding has become final,

(4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and

(5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

*Mullins v. State,* 294 S.W.3d 529, 535 (Tenn. 2009) (citing *Gibson v. Trant,* 58 S.W.3d at 118 (Birch, J., concurring and dissenting) and *Beaty v. McGraw,* 15 S.W.3d 819, 824–25 (Tenn.Ct.App.1998)).

Regardless of whether Tennessee or Sixth Circuit precedent is applied,[2] the doctrine of collateral estoppel is substantively identical. For purposes of this motion to reconsider the most pertinent elements is whether the issue actually decided by the Tennessee Supreme Court is (1) identical to the precise issue raised here, and (2) whether this issue was decided on the merits in the earlier litigation. *St. Thomas Hosp.,* 705 F.Supp2d at 915; *Mullins,* 294 S.W.3d at 535.

> **b.    Collateral estoppel does not apply to this Fourteenth Amendment coercion claim, as the Tennessee facial challenge was decided solely based on the Eighth Amendment, *Glossip v. Gross* and the Tennessee court's application of their procedural rules to the feasible and readily available alternative prong.**

---

[2] It appears to counsel that, while Sixth Circuit law is often applied, it is more correct, in an action under § 1983 to apply the law of the forum state. *Donovan v. Thames,* 105 F.3d 291, 294 (6th Cir. 1997) ("issues actually litigated in a state-court proceeding are entitled to preclusive effect in a subsequent federal § 1983 suit to the extent provided by the law of preclusion in the state where the judgment was rendered."

3

This Court dismissed Count I of the complaint holding "the plaintiff is estopped from relitigating the constitutionality of [the current three-drug] protocol in this Court." Order, p. 3, D.E. 8, PageID #50. Mr. Zagorski does not intend to relitigate that issue. Count I of the complaint raises a Fourteenth Amendment coercion claim, animated by the unconstitutional conditions doctrine, and based on a body of Supreme Court precedent that is separate and distinct from the *Glossip* line of 8th Amendment law. Not only are the issues not "precisely" the same, as required—they are radically different, and no court has issued a final determination on their merits. *St. Thomas Hosp.*, 705 F.Supp2d at 915; *Mullins*, 294 S.W.3d at 535.

The issue that was litigated and decided in the state court is whether, on its face, the current three-drug protocol violates the Eighth Amendment under *Glossip v. Gross* as to **all** inmates sentenced to death. *Abdur'Rahman v. Parker,* – S.W.3d.-- , 2018 WL 4858002 (Tenn. Oct. 8, 2018). Presented here is a claim under the 14th Amendment, regarding the coercive impact of Tennessee's three-drug protocol in forcing Mr. Zagorski, individually, to waive his 8th Amendment rights. Mr. Zagorski's challenge cannot be a facial challenge applicable to all of the condemned, as it only applies to (1) defendants whose crimes were committed prior to January 1, 1999 and who are thus provided the option of choosing the electric chair, Tenn.Code

Ann. § 40-23-114, and (2) those individuals who would be coerced by Tennessee's three-drug protocol into choosing death by electrocution.[3]

The Tennessee Supreme Court denied relief solely based on their conclusion that, under Tennessee procedural and evidentiary rules, the plaintiffs failed to plead and prove a feasible and readily available alternative, as required by *Glossip*. *Abdur'Rahman*, at *13.[4] The Tennessee Supreme Court declined to address whether the three-drug protocol would inflict "severe pain"—finding this issue was "pretermitted" by their procedural holdings regarding the alternative prong. *Id.* at *13-14. Thus, the central issue of this coercion claim—whether an inmate can reasonably fear torture under the three-drug protocol was not even implicitly addressed by the Tennessee Supreme Court.

Here, in Count I, Mr. Zagorski relies on a different constitutional amendment and a different body of law. He alleges that he was coerced into waiving his 8th Amendment right against cruel and unusual punishment, **in violation of the 14th Amendment.** *Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 604 (2013); *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991); *Garrity v. State of N.J.*,

---

[3] Just as not every innocent arrestee who is beaten will succumb and provide a false confession, not every individual condemned to death will find the three-drug protocol so awful that they would prefer to be set on fire by electricity.

[4] The plaintiffs attempted to raise a two-drug alternative, that defendant, Commissioner Tony Parker, acknowledged could be implemented, and that expert proof established would eliminate entirely the severe pain and needless suffering of vecuronium bromide; as a technical pleading matter the Tennessee courts declined to address this alternative. *Abdur'Rahman*, at *10-12. As a factual matter, and based on their ruling upholding the secrecy privileges of the "drug procurer," the Tennessee Supreme Court also rejected a one-drug pentobarbital protocol. *Id.* at *12-13.

5

385 U.S. 493, 498 (1967); *Waley v. Johnston*, 316 U.S. 101, 102-03 (1942); *Bagley v. Harvey*, 718 F.2d 921, 924 (9th Cir. 1983).

The finding of the Tennessee Supreme Court that the plaintiffs failed to carry their burden and prove that the three-drug protocol is unconstitutional, is of no relevance to Mr. Zagorski's claim. Controlling Supreme Court precedent makes clear that a due process violation can be created by the coercive effect of a **constitutional** punishment. *U.S. v. Jackson*, 390 U.S. 570, 581-82 (1968). In *Jackson*, the Supreme Court found that it was unconstitutional to impose the death penalty on only those defendants who proceeded to trial—while sparing the lives of all defendants who pled guilty. *Id.* at 571-72. Clearly, in 1968, the death penalty was fully constitutional. However, the threat of this **constitutional** punishment was found sufficient to "discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial" in violation of due process. *Id.* at 582. 582 fn. 20. The court held that it was unconstitutional to "needlessly chill the exercise of basic constitutional rights." *Id.*

The vast majority of unconstitutional coercion cases involve the coercive impact of constitutional acts. *E.g. National Federation of Independent Business v. Sibelius*, 567 U.S. 519 (2012) (threat of loss of government funding); *Perry v. Sindermann*, 408 U.S. 593 (1972) (threat of not having contract renewed) *Garrity v. State of New Jersey*, 385 U.S. 493 (1967) (threat of being fired). Even those cases that involve physical force, did not necessarily involve levels of force that would ever

6

be actionable under § 1983. Clearly, the threat of **constitutional** government action can violate due process.

Thus, this precise issue was not litigated in Tennessee and this issue was certainly not determined on its merits. *St. Thomas Hosp.*, 705 F.Supp2d at 915; *Mullins*, 294 S.W.3d at 535. The fact that the Tennessee Supreme Court found that the plaintiffs failed to prove a feasible and readily available alternative, has absolutely no bearing on this Fourteenth Amendment due process claim. Collateral estoppel does not apply.

## II. Count II: A coerced decision is not a waiver under *Stewart v. LaGrand*, 526 U.S. 1095 (1999).

*LaGrand* was decided under very different and very specific circumstances.[5] *LaGrand* presumes a valid waiver of a constitutional right. 526 U.S. at 1020, relying on *Johnson v. Zerbst*, 304 U.S. 458 (1938). Coerced waivers are not valid waivers. Walter LaGrand's choice was between the gas chamber (that the Ninth Circuit held unconstitutional[6]) and a lethal injection protocol that LaGrand did not challenge and that would protect him from the effects of the second and third drugs if properly administered.

Here, Mr. Zagorski tried to challenge the constitutionality of electrocution in 2014. The Tennessee Supreme Court stopped him from doing so because the issue

---

[5] LaGrand's challenge to lethal gas was brought in his habeas case, not in a civil right's action. The Supreme Court found that LaGrand had procedurally defaulted his eighth amendment challenge to lethal gas. 526 U.S. at 1021.
[6] *Fierro v. Gomez*, 77 F.3d 301 (9th Cir. 1996) (judgment vacated in light of statutory change *Gomez v. Fierro*, 519 U.S. 918 (1996).

7

was not ripe. *West v. Schofield*, 468 S.W.3d 482 (Tenn. 2015). When Tennessee

adopted the new and plainly torturous midazolam-based three drug protocol, Mr.

Zagorski expeditiously and diligently challenged its use. The Tennessee Courts

prevented a full and fair adjudication of the feasible and readily available

alternative prong of his eighth amendment challenge by perverting a public records

statutory exception to prohibit access to the only persons with knowledge of the

state's efforts to obtain a suitable first drug. By fast-tracking the litigation and

preventing discovery, Mr. Zagorski was faced with a horrible choice: 10-18 minutes

(or longer) of certain physical and mental torture or 15-30 seconds (if it works the

first time) of barbaric physical pain and physical disfigurement of his body. This is

coercion. Waivers induced by threat of physical or mental harm are not valid.

*Arizona v. Fulminante*, 499 U.S. 279 (1990); *Blackburn v. Alabama*, 361 U.S. 199

(1960); *Payne v. Arkansas*, 356 U.S. 560 (1958). *LaGrand* does not apply.

## III. Conclusion

Respectfully, the Court should reconsider its order dismissing Counts I and

II of Zagorski's complaint. Further, the Court should enter a Temporary

Restraining Order and/or Preliminary Injunction as described in Part Two of this

pleading. Counsel advises the Court that two experts, Professor John Wikswo and

former warden Ronald McAndrew, have been retained. Professor Wikswo can be

available for a hearing on Tuesday or Wednesday of this week. Mr. McAndrew is in

trial during the early part of this week, but can be physically present on Thursday,

Case 3:18-cv-01205   Document 9   Filed 10/28/18   Page 8 of 39 PageID #: 59

and possibly available by telephone on Tuesday or Wednesday depending on when he is called to testify.

## Part Two: Emergency Motion for Temporary Restraining Order and Preliminary Injunction

Mr. Zagorski respectfully moves this Court to enjoin Defendants from (1) executing him by electrocution using either the three-drug Tennessee lethal injection protocol or the electric chair; and (2) executing him in any manner unless they provide him the right to two attorney witnesses, who have immediate telephone access and an ability to communicate between themselves.

Mr. Zagorski has been unconstitutionally coerced by threat of torture by Tennessee's midazolam-based lethal injection protocol to choose electrocution in Tennessee's electric chair, which itself is unconstitutional. The Tennessee Supreme Court held that Mr. Zagorski's constitutional challenge to electrocution when the State added it as an option several years ago was not yet ripe. Thus, the constitutionality of Tennessee's electrocution protocol has not been determined by any court.

## STANDARD

The same standard generally applies to the issuance of temporary restraining orders and preliminary injunctions. *Northeast Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). The court must assess four factors to determine whether a plaintiff is entitled to a preliminary injunction: "(1) whether [a movant] has demonstrated a strong likelihood of success on the merits; (2) whether he will suffer irreparable injury in

9

the absence of equitable relief; (3) whether the stay will cause substantial harm to others; and (4) whether the public interest is best served by granting the stay." *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

Cases like this hinge on an inmate's ability to establish a likelihood of success on the merits of his challenge. *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015); *In re Ohio Execution Protocol,* 881 F.3d 447, 449 (6th Cir. 2018). Mr. Zagorski focuses here on his likelihood to succeed on the merits of his claims, as he clearly satisfies the other standards for injunctive relief. He faces irreparable injury if his execution by electrocution goes forward. Conducting a constitutional execution does not harm the state or the public. It is in the public interest that no one be tortured in their name. Moreover, Mr. Zagorski has acted in a timely manner to challenge this execution, filing this suit within four days of the Tennessee Supreme Court setting an expedited execution schedule.

I.    **Defendants have unconstitutionally coerced Mr. Zagorski by threat of torture from a midazolam-based lethal injection protocol to choose to die a torturous death in Tennessee's electric chair instead.**

Mr. Zagorski recognizes that he is sentenced to death and that he will be killed by the State of Tennessee. He realizes that the Constitution does not require the "avoidance of all risk of pain," and that a properly conducted execution may inadvertently involve some measure of pain and suffering. *Baze v. Rees*, 553 U.S. 35, 47 (2008). He knows that he is not entitled to choose his "favorite method of

dying."

Mr. Zagorski is, however, entitled under Tennessee law to choose between two methods of death: death in the electric chair and death by lethal injection (which, in present form, is death by poisoning). Tenn. Code Ann. § 40-23-114. Neither method of execution involves the mere risk of pain—rather, in their present forms, both methods involve the certainty of severe pain, mental anguish and needless suffering.[7]

Given that certainty of suffering, Mr. Zagorski chose the electric chair, so that he can die a (hopefully) quick, gruesome and painful death, instead of a slow, very painful and torturous death—masked under a veil of paralysis. Mr. Zagorski will not waver from that choice. For him, dying strapped to a gurney, while *faux* doctors inject him with medicines that are being misused for their "toxic" as opposed to "therapeutic" effects,[8] while witnesses are misled into believing that his absence of movement indicates an absence of pain, is morally unacceptable.

Thus, Mr. Zagorski has chosen to die in a faulty electric chair, designed by a Holocaust-denying charlatan.[9] His choice is the product of profound coercion. Such

---

[7] Under prior lethal injection protocols, this certainty of suffering was not present, nor is it present in the protocols of Texas and Georgia (among other states). It is Tennessee's perverse choice to replace an anesthetic drug with a mere sedative-hypnotic (midazolam) that creates the certainty that lethal injection will inflict grievous suffering.

[8] In prior litigation, the State's pharmacist, Roswell Evans, testified that the purpose of midazolam was not to provide therapeutic protection from pain—rather, in massive doses its toxic (poisonous) impact would be so profound as to drive an inmate into a coma and then death.

[9] *See, e.g.,* https://thesomervillenewsweekly.blog/2016/09/19/mr-death-fred-a-leuchter-jr-working-in-somerville/comment-page-1/ (last visited October 26, 2018 at

Case 3:18-cv-01205   Document 9   Filed 10/28/18   Page 11 of 39 PageID #: 62

coercion is unconstitutional under the Eighth and Fourteenth Amendments, as it led him to select a patently unconstitutional method of his own death.

### A. Mr. Zagorski has an inalienable right to be free from cruel and unusual punishments, including punishments involving torture or barbarity, and those that are repugnant to the standards of decency of a mature society.

Edmund Zagorski possesses an inalienable right that protects him from cruel and unusual punishments provided by the Eighth Amendment to the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976) (applying Eighth Amendment to the states through the Fourteenth Amendment). In particular, the Eighth Amendment is intended to protect Mr. Zagorski from torture and other barbarous methods of punishment. *Id.* (citing *In re Kemmler*, 136 U.S. 436, 447 (1890) and *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878)[10]). As the Supreme Court has held,

> The [Eighth] Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . , against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society.

*Estelle*, 429 U.S. at 102 (internal quotation marks and citations omitted) (alterations in original); *accord Miller v. Alabama*, 567 U.S. 460, 469-70 (2012) (holding Eighth Amendment is examined "less through a historical prism than

---

12:28 p.m.) (noting that Leuchter had no engineering degree, that he ran a shakedown scam on state prison officials threatening to testify for the defense that the chair did not work if they did not buy his chair, and that he tried to disprove the Nazi use of gas chambers at Auschwitz).

[10] *Wilkerson* is commonly cited by the U.S. Supreme Court, among others, as having been decided in 1879. However, to the extent the various reporters and Westlaw are accurate, the decision was issued October 1, 1878. On a small scale, this represents how a small error of law slowly develops until it becomes an accepted truth.

according to the evolving standards of decency that mark the progress of a maturing society").

**B. The threat of death under Tennessee's three-drug lethal injection protocol, with 10 to 18 minutes of suffering, would coerce a normal person to waive a constitutional right.**

As a factual matter, the threat of dying under Tennessee's three-drug protocol would lead a reasonable person to waive almost any constitutional right; few methods of death can be imagined that would be worse. Based on the evidence Mr. Zagorski and other Tennessee inmates presented in state court, the state chancery court found, based on the testimony of "four well-qualified and eminent experts" that midazolam does not "possess strong analgesic properties." The Chancellor found death by this method would be "dreadful and grim."

**1. Death by Tennessee's three-drug, midazolam-based, lethal injection protocol is, in fact, dreadful and grim.**

Death under Tennessee's "dreadful and grim" three-drug lethal injection protocol will inevitably involve three separate and distinct tortures. All of those tortures will be fully experienced by the condemned, as Tennessee does not use an anesthetic drug (such as pentobarbital), or a potent analgesic (such as morphine or fentanyl) to protect the inmate from pain. Instead, Tennessee uses a sedative (anti-anxiety)-hypnotic (sleep aid) called midazolam, in place of an appropriate medication. Midazolam has a single, limited mechanism of action, which renders it incapable of bringing a human to a level of sedation where they are insensate to and unarousable by pain. Drugs like pentobarbital have three more potent mechanisms, which permit deeper levels of sedation (indeed, in sufficient quantities bring about

13

coma and death). Midazolam's limited efficacy, regardless of dose, is called a "ceiling effect," which is not unique to midazolam. Rather, common drugs such as aspirin possess similar ceilings.[11]

Thus, the inmate will experience three distinct types of torture no matter how much midazolam the State of Tennessee injects him with—whether the initial 500 mg, or a double dose of 1,000 mg. First, shortly after the inmate is injected with 100 ml of pH 3.0 acid (which is the vehicle for delivering 500 mg of midazolam) the lining of his lungs will begin to rupture, and blood and fluid will begin to fill the air space—this is pulmonary edema. Multiple witnesses to execution have seen the effects of pulmonary edema, as the condemned men coughed, gasped, labored to breathe, barked, and strained against their restraints, as they fought for breath. The pulmonary edema will produce excitation that will work against midazolam's limited sedative effect, and this will rouse the inmate while inflicting great suffering.

Second, after some minutes of drowning in his own fluids, the inmate will be injected with vecuronium bromide, a paralytic. This drug will first paralyze the small muscles of the face—causing the inmate to look at peace—and then the larger muscles—immobilizing the inmate. Shortly after injection of the paralytic, and while otherwise immobile, the inmate will lose the ability to breathe. The inmate will suffer two terrors and pains: he will directly suffer air hunger and be desperate

---

[11] It is for this reason that two-dozen aspirin are not given in place of real anesthetics when conducting a hip replacement.

14

for breath, second he will live the horror of complete immobility—a state described as being akin to being buried alive. Midazolam cannot protect the inmate from this horror; instead, this horror will further rouse them to greater awareness (albeit, an awareness completely hidden from the outside world—due to the macabre evil of a paralytic).

Third, and finally, one of the most painful drugs used by doctors (but normally only on individuals who are under general anesthesia and completely insensate to pain) will be injected—potassium chloride. This depolarizing drug will "ignite" every nerve fiber in the inmate's body, creating a horrific sensation akin to burning alive from the inside. Midazolam is completely incapable of protecting an inmate from this excruciating pain. Only after 30 to 45 seconds of the most extreme pain imaginable will the inmate's heart stop, and, shortly thereafter, brain death will occur.

Mr. Zagorski is aware of all that has been set forth in this section. His lawyers were ethically required, before he exercised his right of election, to explain these truths to him as best they could.[12] The State of Tennessee did not dispute these truths in briefing or argument before the Tennessee Supreme Court, but instead relied on procedural/legal arguments unrelated to the reality of the suffering.

Four preeminent experts unequivocally established these truths in testimony

---

[12] Few law students expect that one day they will be ethically required to discuss with a client the least awful, least torturous way for the State to kill them.

before a Tennessee trial court: Dr. David Greenblatt, the most-published researcher on midazolam in the United States; Dr. Craig Stevens, a neuropharmacologist who specializes on the effects of drugs on the brain; Dr. Mark Edgar, a professor of pathology who first identified the reality of pulmonary edema in inmates killed with midazolam; and Dr. David Lubarsky, a practicing anesthesiologist (and nationally known researcher) who has first-hand experience with all of the drugs in question, and who has seen what happens to patients who are not properly anesthetized when they are injected with vecuronium bromide or potassium chloride.

Eleven defense attorneys who witnessed horrifying executions of their clients with midazolam also established these truths in trial court testimony. Among these defense attorneys are those who (1) had not had concerns about the effectiveness of lethal injection chemicals when observing multiple prior executions where the state used actual anesthetic drugs, (2) are a 20 year veteran of our armed services, whose character and resolve could not be questioned, and (3) had worked as a "death clerk"—reviewing sentences of death—before becoming a defense attorney. The State did not offer any contrary eye-witness proof and did not challenge the veracity of the testimony these witnesses gave.

Thus, Mr. Zagorski knows that death by three-drug, midazolam-based, lethal injection will be one of the most horrible deaths imaginable. Defendants have not done anything to disabuse him of this truth. Indeed, until he elected death by electrocution, it was their full and knowing intent to use a drug that their own drug supplier had told them would not work.

16

### 2. Courts have found significantly less threatening state action unconstitutionally coercive.

To the extent it is necessary to demonstrate that the horror of Tennessee's macabre lethal injection protocol is coercive, Mr. Zagorski offers by way of example cases in which courts found coercion on significantly less horrifying facts. For example, in *Cooper v. Scroggy,* 845 F.2d 1385 (6th Cir. 1988), a robbery and kidnapping case, it was undisputed that a detective struck one of the defendants in the head, one time, "busting his lip." *Id.* at 1387. Although the defendant alleged other abuse by the police was alleged, for the most part the court did not credit those additional allegations. *Id.* at 1387-92. Nonetheless, the Sixth Circuit easily concluded that the defendant who was struck had his will overborn by police violence. *Id.* at 1391. As to the second defendant, the court found that it was "a closer question." *Id.* The court did not determine whether the second man was punched or abused, but suppressed his confession after "[g]iving heavy weight to the uncontested fact that Cooper's co-arrestee Calloway *was* physically abused." *Id.* at 391-92 (emphasis in opinion). This abuse "created a coercive environment in which Cooper reasonably feared that he too was threatened with physical abuse." *Id.* at 1392. That is, the threat of receiving a "busted lip" like the first defendant, was sufficiently coercive to lead a second defendant to involuntarily confess to kidnapping and robbery.

In *U.S. v. Brown*, 557 F.2d 541 (6th Cir. 1977), the defendant confessed to firebombing a Planned Parenthood clinic after police officers sitting on either side of him in the back of the patrol car injured him on the way to police headquarters. *Id.*

17

at 550-51. After the distraught and crying arrestee begged, "Don't let them beat me," the patrol officer struck him in the head to "shut him up." *Id.* at 552. A police sergeant admitted that the defendant "expressed the fear that he would be beaten before he admitted the firebombing." *Id.* At the time of the confession, the defendant was crying and screaming. *Id.* at 554. The defendant's overall injuries were characterized by two doctors as "minor," and included "abrasions on the cheek, nose, chin, upper lips and a laceration of the wrist and tongue." *Id.* at 553. That is, the threat of incurring more "minor injuries," was sufficient to create an unconstitutional waiver of the right against self-incrimination.

There are a myriad other cases where threats of significantly lesser harms were found to overbear the will of defendants. *See, e.g., U.S. v. Irons*, 646 F. Supp. 2d 927 (E.D. Tenn. 2009) (no physical violence, but threat to arrest defendant's friend, plus being handcuffed next to friend in dark woods, sufficient to coerce confession); *U.S. v. Ivy*, 165 F.3d 397, 402-03 (6th Cir. 1998) (1.5 hours of detention and threat to arrest defendant's girlfriend and take their child into state custody were sufficiently coercive to make consent to search home invalid); *U.S. v. Hurston*, 12 F. Supp. 2d 630 (E.D. Mich. 1998) (5 a.m. arrest at front door of home, coupled with entry of eleven officers into home and restraint of fiancé and her children, rose to level of coercion, so that consent to search was invalid). In none of those cases was torture or direct harm to the defendant threatened.

Defendants' threat to Mr. Zagorski to subject him to a torturous death by

lethal injection is novel, and counsel has been unable to identify similar cases.[13]

Although officers occasionally deliver bruising punches and threaten to arrest

suspects' friends, no reported cases involves a triple threat of drowning in one's own

fluids, being buried alive and then being burned from the inside over a period of 10

to 18 minutes.

The threatened certainty of such torture is more than sufficient to cause a

reasonable person to waive a constitutional right. The threatened certainty of such

torture is so dreadful and grim that a reasonable person would choose to die in Fred

Leuchter's electric chair instead.

### C. Defendants' coercion of Mr. Zagorski to waive a fundamental constitutional right—to be executed in a manner that comports with the Eighth Amendment—is itself unconstitutional.

Over fifty years ago, the Supreme Court made clear that a criminal

defendant cannot be placed "between the rock and the whirlpool," and by way of

duress forced to waive a constitutional right. *Garrity v. State of N.J.,* 385 U.S. 493,

498 (1967). The Court held that the Fourteenth Amendment prohibits coercion that

leads to the waiver of Fifth Amendment rights. *Id.* In *Garrity*, the Court considered

a case in which "[t]he choice given petitioners was either to forfeit their jobs or to

incriminate themselves," and concluded: "The option to lose their means of

---

[13] Various cases out of Guantanamo Bay might be on-point, however, counsel's review of these cases finds that the description of the torture that was employed against various detainees is routinely redacted—thus, while their may be a judicial finding that their confessions were coerced, the factual underpinnings are hidden. *E.g. U.S. v. Ghailani,* 743 F.Supp.2d 261 (E.D.N.Y. 2010); *Bacha v. Obama*, 2009 WL 2149949 (D.D.C. July 17, 2009).

19

livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id.* at 497. The choice Defendants presented to Mr. Zagorski was quite a bit more savage than the unconstitutional choice at issue in *Garrity*

Physical coercion, through the threat of violence and pain, cannot be used to compel the waiver of a constitutional right. *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) ("[A] credible threat [of violence] is sufficient."). Certainly, a confession that is compelled by force may not be used in court—regardless of its truthfulness. *Jackson v. Denno*, 378 U.S. 368, 385-86 (1964); *Reck v. Pate*, 367 U.S. 433 441 (1961) (finding no Fifth Amendment waiver and suppressing confession of a person who was "physically weakened and in intense pain" and had been detained eight days). A waiver of Fourth Amendment protections, and a consent to a search, cannot be "the product of duress or coercion." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). A guilty plea may not be coerced by threats of violence. *Waley v. Johnston*, 316 U.S. 101, 102-03 (1942). Defendants unconstitutionally used the threat of 10 to 18 minutes of "dreadful and grim" suffering by their three-drug lethal injection protocol to coerce Mr. Zagorski to choose to die in a faulty electric chair that will cause him the excruciating pain described below.

The Supreme Court recognizes "an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 604 (2013).

Under this doctrine, numerous coercive acts of the government that would have compelled waiver of constitutional rights have been struck down. *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 257 (1974) (striking down Arizona residency requirement for medical care as violative of Fourteenth Amendment right to travel, as it coerced those with illnesses not seek work in Arizona); *Perry v. Sindermann*, 408 U.S. 593, 587 (1972) (concluding in First Amendment context: "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized or inhibited"). More recently, in *National Federation of Independent Business v. Sibelius*, 567 U.S. 519 (2012), the Supreme Court held that legislation (in that case, a portion of the Affordable Care Act) was unconstitutional if "the coercive nature of an offer is unmistakably clear." *Id.* at 681. Here, the coercive nature of Tennessee's three-drug protocol is terrifyingly clear.

The Supreme Court also has held that the state cannot force a defendant to choose between constitutional rights. For instance, a state cannot force a defendant to waive his Fifth Amendment privilege against self-incrimination in order to challenge a search under the Fourth Amendment. *Simmons v. U.S.*, 390 U.S. 377, 394 (1968) (holding testimony at suppression hearing not admissible against defendant at trial). Similarly, a state cannot force a political office-holder to waive their privilege against self-incrimination in exchange for continuing to serve in political office. *Lefkowitz v. Cunningham*, 431 U.S. 801, 807-08 (1977) (viewing this as coercive choice between exercise of First and Fifth Amendment rights). In *New*

*York v. U.S.*, the Court observed that a "choice between two unconstitutionally coercive regulatory techniques is no choice at all." 505 U.S. 144, 176 (1992). Here, the choice between a slow and horribly painful death by poison, and a (hopefully) fast, yet gruesome death by electric chair cannot be viewed as a real choice, either.

The government cannot "cloak unconstitutional punishments in the mantle of 'choice.'" *Campbell v. Wood,* 18 F.3d 662, 680 (9th Cir. 1994) (considering constitutionality of execution by hanging, despite defendants "option" to die by lethal injection). As the Ninth Circuit recognized over forty years ago, a coercive choice between punishments is no choice at all. *Bagley v. Harvey*, 718 F.2d 921, 924 (9th Cir. 1983).

Ultimately, Defendants placed Mr. Zagorski between the Scylla of electrocution and the Charybdis of poison, and he chose Scylla. That decision, and the threat of torture that produced it, offends both the Eighth and Fourteenth Amendments to the Constitution. *Garrity,* 385 U.S. at 498.

## II. Execution in Tennessee's electric chair, under Tennessee's electrocution protocol, violates the Eighth Amendment.

Mr. Zagorski respectfully moves this Court to enjoin the State of Tennessee from executing him by electrocution. Mr. Zagorski does not argue here that electrocution is per se unconstitutional, but instead that execution in *Tennessee's electric chair* is cruel and unusual punishment in violation of the Eighth Amendment.

Although Mr. Zagorski challenges electrocution only in Tennessee's electric chair—under Tennessee's electrocution protocol—the following is true of all state

22

killings by electrocution, as attested to by Dr. John P. Wikswo, Jr., who holds a

Ph.D. in Physics from Stanford University, is the Founding Director of the

Vanderbilt Institute for Integrative Biosystems Research and Education, and has

been researching judicial electrocution protocols and electrocution equipment since

1992: (1) prisoners can remain alive for some period of time during the electrocution

for various reasons: the heart may not stop immediately when the current contacts

the body; if the heart does stop, it may start again when the current ceases; this

fibrillation over time during the electrocution will gradually reduce cardiac output

until it is insufficient to maintain life; the electrical current causes the skeletal

muscles required for breathing to tetanize (i.e., contract or spasm), such that the

prisoner dies of asphyxiation; and/or organ damage as a result of thermal heating

(i.e., cooking) produces death gradually, Wikswo Aff., Attach. A, at 2; (2) prisoners

may remain conscious and sensate for some period of time during the electrocution:

the skull somewhat protects the brain by providing greater resistance than the skin,

so that the current will primarily travel down the perimeter of the head, down the

torso and legs, until it leaves through the leg electrodes, *id.* at 2-3; (3) because

prisoners can remain alive, conscious, and sensate during at least a portion of the

duration of a judicial electrocution event, for numerous reasons they can experience

excruciating pain and suffering during the event: the high-voltage electrical current

produces severe burns; the current thermally heats (i.e., cooks) the body and

internal organs; the current directly excites most if not all nerves along its path; the

current excites some brain neurons causing extreme pain as well as sensations of

23

sound, light, dread, and fear; the current tetanizes all muscles simultaneously; the tetanized breathing muscles cause the sensation of suffocating; time perception may be altered such that the prisoner experiences each cycle of current and/or perceives the electrical trauma as lasting dramatically longer than it would appear to a bystander, *id.* at 3-4; (4) because contact with high voltage electrical current causes muscles to malfunction and because Tennessee inmates are harnessed tightly onto the electrocution equipment, a prisoner is unable to signal that he is experiencing pain and suffering during an electrocution execution, *id.* at 4; (5) because of the unpredictability and variability of each prisoner's electrical resistance and that of the connections to his body during an electrocution execution, the current delivered to each prisoner will vary significantly from the currents delivered to other prisoners, such that the time an individual prisoner will remain alive, conscious, and sensate are unknown and will vary substantially from prisoner to prisoner, *id.*; (6) because prisoners can remain alive at the end of an electrocution execution and the medical doctor waits five minutes before examining the body for signs of life, an inmate who survives the electrocution process will die from thermal heating (cooking of their vital organs) and asphyxiation during this time, *id. See also id.* at 1 (detailing the nature of Dr. Wiskswo's research and the bases for his conclusions). To show the horrific mutilation of the human body execution in an electric chair can cause, Mr. Zagorski has attached photographs from autopsies of inmates who suffered such fates. Attach. B (Allen Lee Davis, executed in Florida in 1999); Attach. C (Jesse Tafero, executed in Florida in 1990).

Dr. Wikswo reviewed TDOC's electrocution protocol (Attach. D); an autopsy of Daryl Holton, who Tennessee executed by electrocution in 2007, and other associated postmortem reports (Attach. E): color photographs of Mr. Holton's body taken at autopsy (Attach. F); and newspaper accounts of Mr. Holton's execution. Wikswo at 4-5. Tennessee's electrocution protocol calls for an initial 20 second application of a 1,750 volts, 7 amps, 60 HZ alternating electrical current, a 15 second "disengage" period, and a 15 second "re-engage" period of the same voltage of alternating electrical current. Electrocution Protocol at 42; Wikswo Aff. at 5. Dr. Wikswo's expert opinion is that the above conclusions about the excruciating pain, likelihood of lingering death, and disfigurement of the body attendant to death by electrocution apply similarly to Tennessee's electrocution process. *Id.* at 5-7 (detailing the consequences of specific provisions in Tennessee's electrocution protocol). In particular, the initial 20 second application of electrical current will not provide a long enough time for a prisoner to die because (1) it will not necessarily stop the heart, and (2) when the current stops the skeletal muscles needed for respiration will relax, and air will flow into the prisoner's lungs. During the 15 second "disengage period," a prisoner's heart can circulate the newly oxygenated blood to the brain and the rest of the prisoner's body, keeping him alive, possibly conscious, and possibly sensate for the second application of electrical current. *Id.* at 5. Dr. Wikswo details the gruesome conclusions from the autopsy, photographs, and media accounts of Mr. Holton's death, including severe thermal burns all over his body. *Id.* at 6. He also notes superficial blunt force injuries and abrasions to Mr.

25

Holton's scalp, forehead, chin, foot, upper arms, and calf, which are consistent with the witness reports of the prisoner jerking against the straps and electrodes after application of the electric current and the resulting muscle contraction and tetany.

*Id.* Dr. Wikswo

> conclude[s] to a reasonable degree of scientific certainty that there is a substantial risk that a prisoner electrocuted using Tennessee's Electrocution Protocol and electrocution equipment will remain alive, conscious, and sensate for some period of time during the electrocution process and, as a result, will experience for some period of time the excruciating pain and suffering associated with the phenomena that occur when a high voltage electrical current contacts a human being.

*Id.* at 7.

The designer and manufacturer of Tennessee's electric chair, Fred A. Leuchter, does not have, and never has had, an electrical engineering license from any state.[14] Leuchter's claimed expertise in scientific matters has been rejected by trained scientists in the fields in which he claims expertise. For example, Leuchter claimed that the absence of trace elements of lethal gas on bricks he stole from the WWII Auschwitz concentration camp constituted evidence that the Holocaust did not occur. The scientific community has universally rejected his theory.

In addition to the issues identified in Dr. Wikswo's report, prison officials' testing of Tennessee's chair is also inadequate to determine whether the chair is

---

[14] *See Sawyer v. Whitley*, 772 F. Supp. 297, 307 n.11 (E.D. La.), *aff'd*, 945 F.2d 812 (5th Cir. 1991), *as amended* (Nov. 12, 1991), *aff'd*, 505 U.S. 333 (1992) (referencing media reports that the State of Massachusetts charged Leuchter with practicing engineering without a license and that he signed a consent agreement stating that he was not and never has been registered as a professional engineer but had represented himself as an engineer when dealing with death penalty states).

26

capable of delivering the necessary current to quickly kill an inmate. They use a "test load box" to simulate an inmate's body to determine whether the current is adequate. As detailed in the complaint, differences in (1) the procedures followed to attach head electrodes to a human head rather than a testing box, and (2) the composition of the material in the test load box versus a human body render the results of the testing on the test load box useless for determining whether the current will be sufficient to quickly kill a human. The test load box consists of constant material that reliably provides constant resistance to the current, whereas the material contained in a human body varies within each body and, obviously, varies immensely from individual to individual.[15] Tennessee's chair and testing procedures do not account for the large impact these differences make on the current delivered to an inmate. As Dr. Wikswo explains, individual prisoners will vary widely in the pain experienced by electrocution because of the differences in their bodies, in their physiological responses and thresholds for sensing electrical current, and in the amount of electrical current and amount of time required to render them unconscious.

As a result of the barbarity of killing inmates by electrocution, no state currently mandates it as the primary method of carrying out judicial executions. Numerous states have discontinued use of electrocution as a means of executing inmates. Neither the federal government nor any other nation in the world executes

---

[15] Mr. Zagorski does not possess a typical human body, as he has more muscle mass than most (having recently done 12,001 pushups over a couple of days).

prisoners by electrocuting them. In 2001, the Georgia Supreme Court declared that execution in the electric chair violated the state constitution, because of the attendant "specter of excruciating pain" and the "certainty of cooked brains and blistered bodies." *Dawson v. Georgia*, 554 S.E.2d 137, 144 (Ga. 2001).

In 2008, the Nebraska Supreme Court declared that executions in the electric chair violated its state constitution, finding that it causes "intolerable pain," *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008), based on the following findings by the trial court:

> ... Electrocution as a method of executing condemned prisoners is an extremely violent method of accomplishing death. It includes some burning, smoke, and involves extreme contortion of muscles and tissue of almost every part of a person's body. It includes no effort at all to anesthetize the person into unconsciousness before the mechanisms of death are employed.

> ... [T]here is no question that the Nebraska practice of executing condemned prisoners exclusively by electrocution is unique, outdated, and rejected by virtually all the rest of the world; including practices for the euthanasia of non-human animals. There is also no question that its continued use will result in unnecessary pain, suffering, and torture for some, but not all of [the] condemned murderers in this state. Which ones or how many will experience this gruesome form of death and suffer unnecessarily; and which ones will pass with little conscious suffering cannot be known.

> ... [The trial court] clearly found that some prisoners would remain conscious for 15 to 30 seconds or during the entire application of the current. . . . The evidence fully supports those findings and undercuts the State's theory of instantaneous death.

*Id.* at 272. The court concluded:

> Besides presenting a substantial risk of unnecessary pain, we conclude that electrocution is unnecessarily cruel in its purposeless infliction of physical violence and mutilation of the prisoner's body. Electrocution's proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity of man.

*Id.* at 279.

In considering this challenge, the Court must consider four criteria: (1) whether a method of execution comports with the contemporary norms and standards of society; (2) whether a method of execution offends the dignity of the prisoner and society; (3) whether a method of execution inflicts unnecessary physical pain; and (4) whether a method of execution inflicts unnecessary psychological suffering, including the requirement that the method of execution not violate evolving standards of decency. *Weems v. United States*, 217 U.S. 349, 373 (1910).

Execution by electrocution in Tennessee's electric chair is unconstitutional under each of these considerations. First, electrocution does not comport with the contemporary norms and standards of society. *See Hall v. Florida*, 572 U.S. __, 134 S. Ct. 1986 (2014) (assessing a state's punishment against the evolving standards of decency that mark the progress of a maturing society); *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (same). This is discussed further below under the fourth *Weems* consideration, which is similar.

Second, electrocution offends the dignity of the prisoner and society. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("The Eighth Amendment also demands that a penalty accord with 'the dignity of man.'"); *McCleskey v. Kemp*, 481 U.S. 279, 300 (1987) (capital punishment must accord with the dignity of man); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (holding that the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency"). A review

of Dr. Wikswo's analysis of the effects electrocution has on the human body and the autopsy report, photographs, and media accounts of Mr. Holton's body lay bare the barbarity of strapping a human being to a chair wired with electricity and electrocuting him to death. Indeed, the State's decision to place a hood over the inmate's head so that the executioners and onlookers do not have to see his face as the electric currents jolt his body is a strong indication of the extreme breach of the dignity of the inmate and society. The autopsy pictures of his body are horrific.

Third, electrocution inflicts unnecessary physical pain. In *Wilkerson v. State of Utah*, 99 U.S. 130 (1878), the United States Supreme Court observed that the terms "cruel and unusual" were difficult to "define with exactness" and declined to provide a comprehensive definition. *Id.* at 136. The terms "cruel" and "unusual" are by their very nature mutable. What may well have been accepted, or even deemed essential, in an earlier time (e.g., burning at the stake) now unquestionably would be both cruel and unusual. The Eighth Amendment prohibits punishments that include torture, lingering death, wanton infliction of pain, or like methods. *Estelle v. Gamble*, 429 U.S. 97, 102; *In re Kemmler*, 136 U.S. 436, 447 (1890) (holding that a method of execution violates the Eighth Amendment not just when it inflicts unnecessary pain, but also when it creates a lingering death). As carefully detailed in Dr. Wikswo's affidavit, an inmate being killed by electrocution in Tennessee will experience torture, lingering death, and extreme, needless, wanton pain.

Fourth, death in Tennessee's electric chair will inflict unnecessary psychological suffering, as the inmate is likely to be aware of and able to feel the

30

excruciatingly painful effects of the high-voltage electrical currents being sent through his body.

In addition, electrocution violates evolving standards of decency. In order to determine which punishments are so disproportionate as to be cruel and unusual, the Supreme Court has "established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society.'" *Roper v. Simmons*, 543 U.S. 551, 560–61 (2005) (quoting *Trop*, 356 U.S. at 100-01). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C.J., dissenting)).

An execution method can be unconstitutional if the method represents "devolution to a more primitive" method. *Glossip*, 135 S. Ct. at 2796- 97 (Sotomayor, J., dissenting). A national consensus can exist against a punishment even though it is legally permitted by a majority of states. The mere infrequency of a particular punishment suffices to establish a national consensus against the practice. *Graham v. Florida*, 560 U.S. 48, 62–67 (2010). When deciding whether a punishment practice is "unusual" in the constitutional sense, the Supreme Court has looked to the number of states engaging in that practice. *See, e.g., Atkins v. Virginia*, 536 U.S. 304, 313-16 (2002); *Roper*, 543 U.S. at 564-66; *Glossip*, 135 S. Ct. at 2777 (Breyer, J., dissenting). The meaning of "cruel" and "unusual" as used by the

Framers in drafting the Eighth Amendment should be determined by looking to the evolving practices of the "advanced" societies that share the country's Anglo-Saxon heritage. *See Roper*, 543 U.S. 561; *Atkins*, 536 U.S. at 321; *Thompson v. Oklahoma*, 487 U.S. 815, 826-30 (1988). The "consistency of direction of change" away from a particular punishment is also a relevant factor in evaluating whether our society, as a whole, still tolerates the punishment. *See Roper*, 543 U.S. at 566. As outlined above, no state currently mandates electrocution as the primary method of carrying out judicial executions. Although nineteen states once used electrocution as their sole method of execution, the barbaric nature of the practice, seen through evolving standards of decency, caused each of these states to eventually abandon the method as inhumane. Electrocution is simply not used as a means of execution by any state, the federal government, or any other nation in the world.

Mr. Zagorski respectfully requests an injunction forbidding Defendants from executing him by electrocution, as the evidence demonstrates the truth of the conclusions of the Georgia and Nebraska Supreme Courts: death in Tennessee's electric chair will cause severe pain, mental anguish, and needless suffering, a lingering death, and mutilation of the human body. It is clearly inconsistent with the evolving standards of decency and does not comport with the Eighth Amendment's requirement to respect Mr. Zagorski's dignity.

### III. Tennessee's death penalty statute violates Mr. Zagorski's constitutional right to access to courts and right to counsel.

Tennessee's death penalty statute violates Mr. Zagorski's constitutional right to access to courts and right to counsel as secured by the First, Eighth, and

Fourteenth Amendments, as it allows only a single "defense counsel chosen by the condemned person" to be present for an inmate's execution, and does not provide counsel with the right to telephone access during the execution. Tenn. Code Ann. § 40-23-116(a)(8). Mr. Zagorski's proof at his state-court lethal injection trial established that, although there are several telephones in the official witness room, Defendants, acting pursuant to Section 116(a)(8), refuse to allow inmates' counsel to use one of the available land lines to access the courts or co-counsel during an execution. Defendants also refuse to allow inmates' counsel to have a cell phone when observing an execution. Moreover, the statute only allow one attorney to be present at an inmate's execution. As such, if Mr. Zagorski needs access to a court during his execution, the attorney would have to leave the observation room and return through several security gates to the parking lot to use their personal cell phones, during which time Mr. Zagorski will have no attorney observing his execution. Further, counsel will not have information about what has transpired during his or her journey to the parking lot.

"It is clear that prisoners have a constitutional right to have meaningful access to the courts . . . ." *Lewis v. Casey*, 518 U.S. 343, 347 (1996). The "right to file for legal redress" is more valuable to a prisoner than to any other citizen: "Inasmuch as one convicted of a serious crime and imprisoned usually is divested of the franchise, the right to file a court action stands . . . as his most 'fundamental political right, because [it is] preservative of all rights.'" *Thaddeus–X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 15 (1992))

(Blackmun, J., concurring in the judgment). Thus, "inmate access [must be] adequate, effective and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). In evaluating a claim of denial of meaningful access to the courts, courts must "weigh[] the interests of the prison as an institution (in such matters as security and effective operation) with the constitutional rights retained by the inmates." *Thaddeus–X*, 175 F.3d at 390; *see also Turner v. Safley*, 482 U.S. 78, 89–91 (1987). In order to raise a claim, a prisoner must demonstrate that he "ha[s] suffered, or will imminently suffer, actual harm." *See Lewis*, 518 U.S. at 349; *accord Hadix v. Johnson*, 182 F.3d 400, 404–06 (6th Cir.1999).

This Court has held that an inmate

> has the right under the First, Eighth and Fourteenth Amendments to have some access to his counsel during the last hour before the execution and to have his counsel witness the execution, from either the witness room or a room with closed circuit live television transmission. His counsel must have access to a telephone with an unimpeded outside line at the time that he or she witnesses the execution.

*Coe v. Bell*, 89 F. Supp. 2d 962, 967 (M.D. Tenn.) (Trauger, J.), *vacated as moot*, 230 F.3d 1357 (6th Cir. 2000). This court held that, "given society's (and the state's) interest in assuring that capital punishment is carried out in a humane manner and the minimal inconvenience to the state, this court finds the plaintiff's position well taken." *Id.* at 966. Thus, the court held that inmate Coe was "entitled to an injunction prohibiting Defendant from preventing his counsel from witnessing Plaintiff's execution in order to safeguard Plaintiff's constitutional right of access to the courts to address violations of his Eighth Amendment right against cruel and unusual punishment." *Id.* at 967. Although the Sixth Circuit vacated this Court's

34

injunction on appeal, that was only because the case was moot and did not fit the capable-of-repetition-yet-evading review exception to the mootness doctrine, partly because an inmate in Coe's position would have time to litigate the issue again and partly because Tennessee had subsequently enacted a statute providing an inmate the right to have counsel present for his execution. *Id.*; *see* Tenn. Code Ann. § 40-23-116(8).

This court's reasoning in *Coe* is sound and should be followed here. Pursuant to Section 116(a)(8)—passed after this Court's injunction in *Coe*—Defendants now permit one counsel to be physically present for Plaintiff's executions. However, given the inadequacies of Tennessee's electric chair and electrocution protocol, counsel's mere presence is not sufficient to ensure Mr. Zagorski's right to counsel and the courts. As a result of the inherent problems with Tennessee's electric chair and electrocution protocol, Mr. Zagorski's execution will likely be torturous, yet his counsel will be unable to reach a court in time to seek redress. As the Court reasoned in *Coe*, counsel must have access to an outside telephone line to contact the court to alert it to any Eighth Amendment violation during an execution. As Mr. Zagorski has shown that he will "imminently suffer actual harm," *Lewis*, 518 U.S. at 349, by lack of access to counsel and the courts, his constitutional rights must be weighed against the prison's interests in such matters as security and effective operation. *Thaddeus–X*, 175 F.3d at 390.

Defendants have given no justification sufficient to deny defense counsel telephone access and thus impede inmates' access to courts during their execution.

In her testimony in the state-court lethal injection trial this summer, Debbie Inglis, General Counsel for TDOC, was startlingly honest that the reason TDOC deprives counsel of a phone is because it *affirmatively does not want* counsel to be able to reach the Court:

> Q: Do you see any problems with having a phone in there for the defense attorney?
>
> A: I do see some issues.
>
> Q: What issues?
>
> A: Yes. I mean, there's not to be any photographing or recording. That's one. The other would be interruption of an execution without knowing sort of – the Court not having enough information to make a decision about what would happen if an execution was staying in the middle of it.
>
> Q: But would you agree that if a lawyer is not permitted to have a phone to call the Court if a problem comes up, that the execution may go forward in a manner that would be unconstitutional?
>
> A Well, no. I'm not going to agree with that, but the attorney can leave and call the Court.

Attach. G (Inglis Dep.) Commissioner Parker testified in deposition in the state-court case that he saw no problem with allowing counsel to have an outside phone line. Attach. H ("I would certainly not be opposed in any way to providing the attorneys access to communications that they would need to do their job.")

In a recent dissent from the Supreme Court's denial of an application for stay of execution and denial of certiorari, Justice Sotomayor articulated perfectly inmates' right to counsel and to access to the courts:

> I continue to doubt whether Midazolam is capable of rendering prisoners insensate to the excruciating pain of lethal injection and thus whether Midazolam may be constitutionally used in lethal injection protocols. . .

36

. When prison officials seek to limit that right, the restriction is permitted only if "it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Here, the State has no legitimate reason—penological or otherwise—to prohibit Arthur's counsel from possessing a phone during the execution, particularly in light of the demonstrated risk that Midazolam will fail. *See Arthur*, 580 U. S., at ——, 137 S. Ct., at 733 (detailing "mounting firsthand evidence that Midazolam is simply unable to render prisoners insensate to the pain of execution"). To permit access to a telephone would impose no cost or burden on the State; Arthur's attorneys have offered to pay for the phone and provide it for the State's inspection. The State's refusal serves only to frustrate any effort by Arthur's attorneys to petition the courts in the event of yet another botched execution. Its action means that when Thomas Arthur enters the execution chamber tonight, he will leave his constitutional rights at the door.

*Arthur v. Dunn*, 137 S. Ct. 1521, 1522 (Sotomayor, J., dissenting) (some citations omitted).

Although the Supreme Court did not decide to grant cert in the *Arthur* case, that cannot be interpreted as a repudiation of Justice Sotomayor's concerns given the small percentage of cases in which the Court grants certiorari and the myriad reasons it may deny certiorari in any particular case. Justice Sotomayor's opinion is persuasive authority on the merit of Mr. Zagorski's claims that Defendants have "no legitimate reason—penological or otherwise—to prohibit their counsel from having phone access to the court during an execution." *Arthur*, 137 S. Ct. at 1522.

This Court should enjoin Defendants from executing him without allowing him to have two defense attorneys present at his execution, the ability to communicate with each other during the execution, and immediate access to a telephone during his execution.

## CONCLUSION

WHEREFORE, for these reasons and those stated in the Complaint, Edmund

Zagorski is entitled to injunctive relief and respectfully prays the court will:

1) reconsider its ruling dismissing Counts I and II of the complaint;

2) conduct an emergency hearing on this motion;

3) issue a temporary restraining order and/or preliminary injunction restraining defendants from executing plaintiff.

Respectfully submitted,
OFFICE OF THE FEDERAL PUBLIC
DEFENDER FOR THE MIDDLE DISTRICT
OF TENNESSEE

KELLEY J. HENRY, BPR#21113
Supervisory Asst. Federal Public Defender
AMY D. HARWELL, BPR#18691
Asst. Chief, Capital Habeas Unit
RICHARD TENNENT, BPR# 16931
KATHERINE DIX, BPR#022778
JAY O. MARTIN, BPR#18104
810 Broadway, Suite 200
Nashville, TN 37203
Phone: (615) 736-5047
Fax: (615) 736-5265

BY: */s/ Kelley J. Henry*
Counsel for Edmond Zagorski

## CERTIFICATE OF SERIVCE

I, Kelley J. Henry, hereby certify that a true and correct copy of the foregoing document was electronically filed and sent to the following via email on this the 28th day of October 2018 to:

Andree Blumstein
Solicitor General

Jennifer Smith
Asst. Solicitor General
P.O. Box 20207
Nashville, TN 37202-0207

38

Dwight Tarwater
General Counsel
Governor's Office

Debra Inglis
Deputy Commissioner of Administration and General Counsel
Tennessee Department of Correction
6th Floor Rachel Jackson Building
320 6th Avenue North
Nashville, Tennessee 37203-3805

*/s/ Kelley J. Henry*
Kelley J. Henry
Supervisory Asst. Federal Public Defender
